831 A.2d 1120

**Paulette D. BLAYLOCK**

v.

**JOHNS HOPKINS FEDERAL CREDIT UNION.**

No. 1994, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Sept. 9, 2003.

Philip O. Foard (Foard, Gisriel, O'Brien & Ward, LLC on the brief); Kieron F. Quinn and Richard S. Gordon (Quinn, Gordon & Wolf, Chtd. on the brief), Towson, for appellant.

Dennis W. King (Danoff, King & Hofmeister, P.A. on the brief), Towson, for appellee.

Argued before HOLLANDER, SALMON, KENNEY, JJ.

SALMON, Judge.

In November 1997, the automobile of Paulette Blaylock was repossessed and sold by Johns Hopkins Federal Credit Union ("the credit union"). After the sale, the credit union instituted suit in the District Court for Baltimore City, seeking a deficiency judgment against Ms. Blaylock of approximately $8,200. Ms. Blaylock retained the law firm of Quinn, Gordon & Wolf, Chartered, to represent her in the matter. The law firm filed a jury trial demand and a counterclaim against the credit union. In her counterclaim, Ms. Blaylock alleged that the credit union had violated the Maryland Consumer Protection Act, which prohibits unfair or deceptive trade practices in the extension of consumer credit. *See* Md.Code Ann., Com. Law II ("CL") §§ 13–303–13–408(a) (1975, 2000 Repl.Vol.). Much later, in December 1999, she filed an amended counterclaim alleging that the credit union had violated the Uniform Commercial Code by failing to give her accurate pre-sale information concerning when her automobile was to be sold at auction.

After about two-and-a-half years of litigation, the case, save for the issue of attorney's fees due to Ms. Blaylock's counsel, was settled. The terms of the settlement agreement, which was approved by the court, were:

1. The Johns Hopkins Federal Credit Union ("JHFCU"), Plaintiff/Counter–Defendant in this matter, dismisses with prejudice the case against Paulette Blaylock ("Blaylock"), Defendant/Counter–Plaintiff, and releases her and her co-signer Lawrence Smith ("Smith") from further liability.

2. JHFCU agrees to pay Blaylock $7,300.00 in damages.

3. JHFCU agrees that Blaylock is a prevailing party in this matter.

4. Blaylock releases JHFCU from further liability, though Blaylock will retain the right to petition the [c]ourt for reasonable attorney's fees upon the following schedule:

a. Blaylock will submit a Petition for Attorney's Fees on or before September 22, 2000;

b. JHFCU shall respond to the Petition for Attorney's Fees on or before October 10, 2000; and

c. Blaylock shall file a reply brief, if necessary, on or before October 28, 2000.

5. JHFCU agrees to notify and request that the credit reporting bureaus remove any adverse or negative reference on Blaylock's and Smith's credit reports in respect of the automobile loan at issue in this case.

A hearing was held before the circuit court regarding the attorney's fees issue. At the hearing, Ms. Blaylock introduced detailed time records from Quinn, Gordon & Wolf, showing that the law firm had expended 263.8 hours in total paralegal and attorney time in regard to the subject case. According to the bill, paralegal time was billed at $95 per hour; one attorney charged $230 per hour; and a senior partner charged $350 hourly. Total fees were $48,951.97. In addition, Ms. Blaylock was charged $1,038.30 in expenses.

The circuit court awarded Ms. Blaylock's counsel $5,000 for fees and $1,038.30 expenses. Ms. Blaylock filed this timely appeal in which she raises one question, *viz:*

Did the trial judge err in allowing appellant only $5,000 in attorney's fees?

The credit union filed a cross-appeal in which it asks:

Did the trial court err in finding that appellant was entitled to any award of attorney's fees?

## I. BACKGROUND

Ms. Blaylock, an employee of Johns Hopkins and a member of the Johns Hopkins Federal Credit Union, purchased an automobile in 1990. To finance the purchase, she borrowed $9,765.74 from the credit union and agreed to repay the loan, plus interest, in sixty equal monthly payments of $211.38. She signed a note evidencing the debt, as did a co-signer, one Lawrence Smith.

The loan agreement had the following provisions, which are here pertinent:

**Property Insurance:** If I obtain a loan secured by a motor vehicle or other tangible property, I must obtain insurance which protects the credit union from financial loss. Such a policy must provide at least fire, theft, combined additional coverages and collision insurance. It must contain a Loss Payable clause endorsement naming the credit union as lien holder. I may obtain this insurance from any agent of my choice and direct the agent to send you a copy of the policy.

\* \* \*

... I will maintain insurance to cover any vehicle or other property in which you have a security interest. This insurance will be in a form and an amount satisfactory to you. I will supply you with proof of such insurance until all sums owed to you and secured by this property are repaid. *If I fail to maintain such insurance, you may, but are not required to obtain insurance of your own and add the cost of such to the sums owed.* This cost may bear interest at the contract rate until paid....

(Emphasis added.)

In addition, on June 7, 1990, Ms. Blaylock signed a document titled "Borrowers Agreement to Provide Automobile Insurance," which provided:

In consideration for the granting of the loan given on this date I/we agree to provide and maintain in force for the term of such loan, and any extension or renewals thereof, an insurance policy including Comprehensive and Collision Coverages. With loss payable to the JOHNS HOPKINS. FEDERAL CREDIT UNION.

It is understood that proof of insurance is to be delivered to the CREDIT UNION at the earliest possible date.

To facilitate repayment of the loan, Ms. Blaylock authorized her employer to deduct $60 per week and deposit it directly into an account at the credit union. The credit union, in turn, was authorized to deduct $211.38 per month from the account to repay the loan.

For approximately six years, $211.38 was deducted each month to pay off the car loan. For the first six years, Ms. Blaylock, apparently, did not carefully read the periodic loan statements sent to her by the credit union, because, each year, the statement would have a "loan add on" line. The "add ons" were as follows:

| 1990 | $ 1,869.00 |
| 1991 | $ 1,956.00 |
| 1992 | $ 1,247.00 |
| 1993 | $ 1,121.00 |
| 1994 | $ 944.00 |
| 1995 | $ 1,075.00 |
| | |
| TOTAL | $ 8,212.00 |

In 1996, Ms. Blaylock retained John Rhines, Esq., of the law firm of Stancil and Rhines, to find out why she still owed money on the car loan, despite the fact that she had been making her payments regularly for over six years. The credit union was contacted by Mr. Rhines, and sometime in 1996, the credit union, apparently for the first time, advised Ms. Blaylock that they had purchased insurance on her behalf and charged her for it because she had failed to send them proof that she had insured her vehicle.

When insurance is purchased by a creditor on behalf of a debtor, in situations such as this, the purchase is known in the loan business as forced-placement insurance ("FPI").

As a result of Mr. Rhines having contacted the credit union, the latter advised Ms. Blaylock that she would receive a full refund of any monies charged against her account for FPI if she would supply the credit union with proof that her car had the required insurance during the periods that FPI was purchased. Thereafter, Ms. Blaylock supplied proof that she had car insurance for 1996. Accordingly, the credit union deducted $1,001 from the balance she (purportedly) owed. Although Ms. Blaylock maintained that she had her own automobile insurance ever since she purchased the car, she could not provide the credit union with proof of insurance for the period between the date the loan was made in 1990 and the end of 1995.

After the $1,001 deduction, the credit union continued to deduct $211.38 per month for car payments from Ms. Blaylock's account. But in June of 1997, Ms. Blaylock was laid off from her job at Johns Hopkins. As a consequence of the layoff, no additional funds were placed in the credit union account, and her payments ceased. At the time the payments were stopped, Ms. Blaylock had paid $17,775.92 to the credit union on her loan.

Not long after Ms. Blaylock ceased to make payments, the car was repossessed. The credit union, by letter dated October 10, 1997, informed Ms. Blaylock that she still owed $9,124.92 in principal and interest on the car loan. The letter informed Ms. Blaylock that if she did not redeem the vehicle by tendering the full amount due, plus $275 to reimburse the credit company for repossessing the car, the automobile would be sold at public auction on November 11, 1997.

Ms. Blaylock's automobile was sold at public auction on November 1, 1997, i.e., ten days prior to the date mentioned in the credit union's notice. The auction price of the vehicle was $1,600. After crediting Ms. Blaylock in that amount, and deducting costs for repossessing and selling the vehicle, the deficiency owing to the credit union was calculated to be $8,235.54.

In December of 1997, the credit union filed suit against Ms. Blaylock in the District Court of Maryland for Baltimore County. In its statement of claim, the credit union contended that Ms. Blaylock owed $8,235.54 in principal, $224.82 in interest, and $1,235.33 in attorney's fees. Thus, the total amount at issue was approximately $9,695.

As mentioned earlier, Ms. Blaylock prayed for a jury trial, and the case was removed to the Circuit Court for Baltimore County. On March 13, 1998, Ms. Blaylock's attorneys filed a fifteen-page counterclaim against the credit union. Count I of the counterclaim alleged a violation of Maryland's Consumer Protection Act. According to the counterclaim, the credit union was guilty of deceptive trade practices in the extension of consumer credit by charging illegal FPI premiums, making improper "add ons" to Ms. Blaylock's loan balances, and in repossessing her automobile. In addition, the counterclaim asserted causes of action for breach of contract (Count II), fraud (Count III), conversion (Count IV), negligent misrepresentation (Count V), and unjust enrichment (Count VI).

Approximately two years and five months separated the filing of the counterclaim and the settlement of the case. About three months after the counterclaim was filed, Ms. Blaylock's attorneys took the deposition of Mary Boyle, the credit union's "lead accountant," and Charles Colvin, the credit union's collection manager. At the depositions, representatives of the credit union revealed that FPI was obtained from an organization known as Stewarts CPI ("Stewarts"). According to the deposition testimony of Mr. Colvin, representatives of Stewarts would come into the collection office every Thursday to review documentation sent in by various insurance companies concerning coverage of vehicles securing loans made by the credit union. Representatives of Stewarts, using credit union stationery, would notify debtors that FPI insurance had been placed. Copies of such letters were not, however, kept either in the debtor's file or elsewhere.

Besides taking depositions, the law firm retained by Ms. Blaylock sent interrogatories and a motion for production of documents to the credit union.

One odd fact developed in discovery was that Mr. Colvin, the credit manager, did not know if Stewarts "actually wrote an insurance policy" to insure Ms. Blaylock's vehicle; he had never seen such a policy, nor did Stewarts consult with him concerning the amount of premiums charged for FPI. Moreover, Mr. Colvin was unable to say whether anyone at the credit union was consulted in regard to the amount of premiums charged for the FPI. In regard to the premiums, Mr. Colvin acknowledged that many people had told him that the FPI premiums are "the highest . . . in the world."

During discovery, the credit union was asked to produce all documents relating to the FPI. No such documents were produced because the credit union had none. As a consequence, Ms. Blaylock's attorneys attempted to serve a subpoena *duces tecum* on the resident agent of Stewarts, a company headquartered in Illinois. Stewarts failed to respond to the subpoena, and as a result, Ms. Blaylock's attorneys filed a motion to compel on November 16, 1998. The motion was granted, and Stewarts was ordered to produce all subpoenaed documents by December 19, 1998. Stewarts, however, ignored the court's order. On January 14, 1999, Ms. Blaylock filed a petition to find Stewarts in contempt. After the court filed a show cause order, Stewarts produced some, but not all, of the documents requested.

When Ms. Blaylock filed her first amended counterclaim on December 8, 1999, she added a count for the violation of the Uniform Commercial Code (the "UCC"). She did not, however, request attorney's fees as to that count. Shortly thereafter, Ms. Blaylock filed a comprehensive motion for summary judgment as to both the complaint filed by the credit union and as to her counter-claim. While the motion for summary judgment was pending, the parties entered into a stipulation, which read:

1. Paulette Blaylock ("Blaylock") stipulates that for the period from 1990 to 1995 she does not presently have any documentation to establish that she possessed comprehensive or collision insurance on the vehicle that secured her

loan with the Johns Hopkins Federal Credit Union ("JHFCU"), except as otherwise set forth in the record.

2. Blaylock further stipulates that, at present, she has no independent witnesses who can testify that she possessed such insurance on the subject vehicle, though Blaylock maintains that she had such coverage during this period.

3. JHFCU stipulates that it does not now, nor did it ever possess the actual insurance policies purchased on behalf of Ms. Blaylock. Nor does JHFCU, its agents and employees have any actual or personal knowledge that such insurance policies exist.

4. JHFCU further stipulates that it did not directly notify Blaylock that it had purchased collateral protection ("forced placed") insurance, though JHFCU maintains that it was JHFCU's understanding that Blaylock was sent notice of such insurance directly by the insurer.

5. JHFCU further stipulates that it does not presently have any documentation to establish that Blaylock did not possess comprehensive or collision insurance on the vehicle that secured her loan with JHFCU.

6. JHFCU further stipulates it does not now, nor did it ever possess any records or other documents in its files indicating that notice was given to Blaylock by the insurer.

7. JHFCU further stipulates that, at present, it does not have any independent witnesses who can testify that notice was given to Blaylock or that an insurance policy was actually purchased on her behalf.

In support of the summary judgment motion, Ms. Blaylock's counsel filed a twenty-eight page memorandum and eleven exhibits. Later, after the credit union filed its opposition motion, Ms. Blaylock's attorneys filed a fifteen-page reply to the credit union's response. The summary judgment motion was denied on February 16, 2000.

One of the issues discussed in the motion for summary judgment concerned the allegation in the amended counter-claim that the credit union had violated the UCC by giving inaccurate notice to Ms. Blaylock as to the date the repos-

sessed car would be sold. Ms. Blaylock's counsel argued that Maryland courts have consistently held that "compliance with the notice provision of [CL section] 9–504(3) is a condition precedent to recovery of a deficiency judgment." (Citing *Maryland Nat'l Bank v. Wathen*, 288 Md. 119, 126, 414 A.2d 1261 (1980).) In its opposition to the summary judgment motion, the credit union, citing *Ruden v. Citizens Bank and Trust Co.*, 99 Md.App. 605, 638 A.2d 1225 (1994), argued that the court should impose a "less severe penalty" than forfeiture of the deficiency judgment. Suffice it to say, the *Ruden* case did not support the credit union's position, although the motions judge apparently was misled into thinking otherwise.[1]

During the two-and-a-half years this case was pending, the parties went through mediation and there were attempts to settle the case. On November 4, 1998, counsel for Ms. Blaylock offered to settle if (1) both sides dismissed their claims with prejudice, (2) the parties executed mutual releases, (3) the credit union permitted Ms. Blaylock to maintain an action against Stewarts, (4) the credit union paid Ms. Blaylock her outstanding attorney's fees and costs, and (5) the credit union returned any monies taken from Ms. Blaylock's credit union account during the pendency of the action.

In September 1999, Ms. Blaylock's counsel indicated a willingness to settle if the credit union would: (1) pay Ms. Blaylock $5,000, (2) pay Ms. Blaylock's outstanding attorney's fees and costs, and (3) execute a mutual release. Later, on April 10, 2000, Ms. Blaylock's counsel offered to settle on the

---

1. The *Ruden* Court said:

> [*Maryland Nat'l Bank v.*] *Wathen* [288 Md. at 126, 414 A.2d 1261] and [*First Nat'l Bank of Maryland v.*] *DiDomenico* [302 Md. 290, 487 A.2d 646 (1985),] establish unmistakably that in Maryland the failure of a creditor to comply with the notice requirement of § 9–504(3) will operate as an absolute bar to the obtaining of any deficiency judgment against the debtor. Beyond that, however, the field is yet unplowed. In neither *Wathen* nor *DiDomenico* was the Court of Appeals called upon to give any thought to the appropriate sanction in the case of a creditor's non[-]compliance with any provision of § 9–504(3) other than the notice requirement.
>
> 99 Md.App. at 627.

same terms as suggested in September 1999, except that, this time, Ms. Blaylock upped her demand for damages to $10,000.

As mentioned earlier, the subject case ultimately was settled by an agreement dated August 21, 2000. A hearing concerning attorney's fees was held on August 26, 2001. At the hearing, Louise Carwell, Esq., an attorney employed by the Legal Aid Bureau, testified as an expert in consumer litigation. She also submitted an affidavit to the court concerning the legal services provided by Ms. Blaylock's counsel. Mrs. Carwell opined that the time spent litigating the subject case was fair and reasonable and that Ms. Blaylock's counsel's performance was efficient. She also gave the following opinion:

> The result was really exceptional, and that is because of the fact that initially this appeared to be simply a repossession case. I've seen hundreds of those in my years of practice, and on the face, they always appear like many collection cases to be valid and to have a validity to them.

> In this particular case, however, the consumer had not only defenses to the lawsuit, but also had claims that evolved only after really digging to find out what exactly had happened here, and the result then for the consumer was not only that the lawsuit against her was negated, but that she received from a consumer's point of view, a large award. She received an assurance that her credit report would be repaired with respect to this particular issue.

> And so that is not a result that happens very often. Consumer cases where the consumer prevails does [sic] not occur very often, so that was an exceptional result.

The credit union presented no evidence, nor did it contest either the amount of time spent nor the hourly rate charged by Ms. Blaylock's attorney. Counsel for the credit union, however, argued that Ms. Blaylock was entitled to no attorney's fees because she had failed to prove that she had prevailed on the consumer protection count set forth in her counterclaim. The circuit court rejected that contention.

During oral argument, the trial judge and counsel for Ms. Blaylock had the following exchange, which foreshadowed the court's final disposition of the attorney's fees issue, *viz:*

[THE COURT:] I know you have expert testimony saying fifty thousand dollars to save eight thousand dollars is reasonable, but I would personally never pay fifty thousand dollars for a District Court case to save eight thousand dollars, would you?

[MS. BLAYLOCK'S COUNSEL]: Well, Your Honor, it depends upon the complexity of this case.

THE COURT: I'm asking you would you pay fifty thousand dollars to save eight thousand dollars?

[MS. BLAYLOCK'S COUNSEL]: I think it depends on the case.

THE COURT: You would?

[MS. BLAYLOCK'S COUNSEL]: I would.

THE COURT: Okay. See me back in chambers when this is over. If you give me sixty thousand dollars, I'll give you ten back.

[MS. BLAYLOCK'S COUNSEL]: Your Honor, I appreciate the court's comment, but the fact is, when you're dealing with consumer cases, you're going to naturally have that disparity.

One of the cases before the Maryland Court of Special Appeals is *Barnes v. Rosenthal Toyota*—

THE COURT: Let me stop you—

\* \* \*

But I think, in the first place, this was a District Court case. It was filed in District Court, and it was brought up to circuit court by the defendant who prayed a jury trial. I looked through the pleadings, and I see tons of time for discovery, tons of time for summary judgment motions, an enormous amount of time for subpoenas to be issued, considering the complexity of subpoenas for a District Court case basically.

And I know it came to circuit court, but it was still a District Court case. And the complexity issues can be argued in District Court, too. There are contempt petitions, and Stewarts, that's the company that wasn't even a defendant in the case.

\* \* \*

[MS. BLAYLOCK'S COUNSEL]: In cases like this, these are normally run-of-the-mill repossession cases where there are deficiencies owed. In order to determine whether or not the consumer has a claim, there is an extraordinary amount of work that needs to be done.

In connection with discovery, one of the main issues was the placement of forced placed insurance. We tried to obtain those records from Johns Hopkins. They advised us in depositions that we have attached to our brief that they didn't have those records. Then we needed to go to Stewarts. Stewarts wouldn't provide those documents.

THE COURT: It's not their fault.

[MS. BLAYLOCK'S COUNSEL]: Well, it is to an extent. It's part of the case, and if we were going to prove our case on the forced placed insurance, we needed to obtain those records, and ultimately we did.

The trial court's ultimate resolution of this matter was worded as follows:

I see an unbelievable amount of time on a motion for summary judgment, probably half of this was on the motion for summary judgment.[2] This case is ultimately a fifteen-

---

2. The actual breakdown as to hours spent was as follows:

| Drafting Counter–Complaint | 20.1 hrs | 7.6% |
|---|---|---|
| Propounding and Responding to Discovery | | |
| (Both paper discovery and depositions) | 27.3 hrs | 10.3% |
| Discovery Disputes | 38.8 hrs | 14.7% |
| Issuing Subpoenas | 7.8 hrs | 2.9% |
| Drafting and Research | | |
| Motion for Summary Judgment | 44.3 hrs | 16.8% |
| Trial Preparation/Settlement | 46.3 hrs | 17.5% |
| Misc., including preparing mediation | | |

thousand-dollar case. The eight thousand dollars you save and the seven thousand dollars you obtained with change. To award fifty thousand dollars against a fifteen thousand dollar case to me would be unconscionable. So I'm not going to do it.

I'm going to award based on my review of the file, based on the origination of the case, based on the bill, I'm going to award five thousand dollars plus expenses in the amount of $205.36 and $832.97, whatever those two come out to. I think that is fair and reasonable under the results of the case, and that is my ruling.

## I. ANALYSIS

### A. *The Cross–Appeal*

█ The credit union, in its cross-appeal, claims that the trial court erred in making any attorney fee award at all because no court has found "that [the credit union] was guilty of violating the Consumer Protection Act."

In our view, it was unnecessary for any court to find a violation of the Act because the parties agreed, when they signed the settlement agreement, that Ms. Blaylock was the prevailing party in the subject litigation. And, one of her central claims in this litigation was that the credit union, by the way it handled the FPI add ons, had violated the Consumer Protection Act.

█ In construing settlement agreements or any other contract, the court must, if possible, give meaning and effect to all words used by the parties. *East v. PaineWebber, Inc.*, 131 Md.App. 302, 311, 313, 748 A.2d 1082 (2000). Unless the parties contemplated that Ms. Blaylock would be entitled to attorney's fees under the Consumer Protection Act, there is

statement, attending mediation, attending meetings with client, corresponding with client, general factual and legal research, attending court hearings, . .

80.9 hrs 30.2%

no conceivable reason why the parties named her the prevailing party in the litigation. After all, the only count in the counterclaim in which attorney's fees were sought was the count alleging a consumer protection violation. CL section 13–408 reads, in pertinent part:

§ 13–408. **Action for damages.**

(a) *Actions authorized.*—In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.

(b) *Attorney's fees.*—Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees.

 The credit union impliedly argues that Ms. Blaylock was not entitled to attorney's fees because she was "never awarded damages" within the meaning of CL section 13–408(b). The credit union cites no authority, and we are aware of none, that would support such a narrow reading of the statute. *See Marbley v. Bane,* 57 F.3d 224, 234 (2d Cir.1995)("Securing an enforceable decree or agreement may be evidence [of] prevailing party's status, but the judgment or agreement simply embodies and enforces what is sought in bringing the lawsuit.... Victory can be achieved well short of a final judgment (or its equivalent) ....") overruled, to the extent that voluntary change in a party's conduct does not warrant an award of attorney's fees, by *Buckhannon Bd. & Care Home, Inc. v. West Virginia Dep't of Health & Human Res.,* 532 U.S. 598, 602, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001); *see also Associated Builders & Contractors v. Orleans Parish Sch. Bd.,* 919 F.2d 374, 378 (5th Cir.1990)(A party "prevails" for fee-shifting purposes when "its ends are accomplished as a result of the litigation."); *Hennigan v. Ouachita Parish Sch. Bd.,* 749 F.2d 1148, 1153 (5th Cir.1985)("[If a party reaches the] sought after destination, [then the party] prevails [regardless of the] route taken."). *See, e.g., Stewart v. Hannon,*

675 F.2d 846, 851 (7th Cir.1982)(The standard is "whether the [party has] prevailed in a 'practical sense.' "); *Jeffersonville R.R. Co. v. Weinman,* 39 Ind. 231, 232–33 (1872)(costs awarded where defendant voluntarily paid damages but did not either admit liability or permit a judgment to be entered).

■ We therefore hold that, under the Consumer Protection Act, a consumer who achieves victory by means of an agreement approved by the court is entitled to attorney's fees, even though no consent decree or judgment is entered in favor of the prevailing party.

## B.

### Were reasonable attorney's fees awarded?

■ The circuit court awarded Ms. Blaylock all the costs incurred in this litigation but gave her only about ten percent of the legal fees she sought. A reading of what the court said in its oral opinion, together with the court's discussion with appellant's counsel (quoted *supra* ) make it crystalline that one of the main reasons that the court did not award $48,951.97 in attorney's fees was that such an amount was disproportionate to the amount of Ms. Blaylock's gain from the efforts of counsel, which was $16,895.56.[3] In *Jordan v. Transnational Motors, Inc.,* 212 Mich.App. 94, 537 N.W.2d 471, 474 (1995), the court said:

In [a] consumer protection [case such] as this, the monetary value of the case is typically low. If courts focus only on the dollar value and the result of the case when awarding attorney fees, the remedial purposes of the statutes in question will be thwarted. Simply put, if attorney fee awards in these cases do not provide a reasonable return, it will be economically impossible for attorneys to represent their clients. Thus, practically speaking, the door to the

**3.** The credit union, in its complaint, sought a deficiency judgment in the total amount of $9,695.56, and the appellant recovered $7,200 in damages as a result of the settlement. Those two figures combined total $16,895.56.

courtroom will be closed to all but those with either potentially substantial damages, or those with sufficient economic resources to afford the litigation expenses involved. Such a situation would indeed be ironic: it is but precisely those with ordinary consumer complaints and those who cannot afford their attorney fees for whom these remedial acts are intended.

Appellant argues:

It is well established that attorney's fee awards in consumer and other analogous cases should not be reduced or discounted based upon a proportionality analysis in which the amount recovered is compared to the effort required to win. In *Riverside v. Rivera*, 477 U.S. 561, 578, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986), for example, the Supreme Court held that, "[a] rule of proportionality would make it difficult, if not impossible, for individuals with meritorious ... claims but relatively small potential damages to obtain redress from the courts." *Id.* at 578, 106 S.Ct. 2686.

Appellant cites numerous additional cases in support of the above argument. Among the cases cited is *Bittner v. Tri–County Toyota Inc.*, 58 Ohio St.3d 143, 569 N.E.2d 464 (1991).

The *Bittner* case arose out of a claim for attorney's fees made by Cheryl Bittner ("Bittner") against a car dealer. *Id.* Bittner gave the car dealer a $1,000 deposit to apply toward her purchase of an automobile, after Bittner and the car dealer had agreed on a $10,500 purchase price. *Id.* Later that same day, the car dealer sold the automobile Bittner had purchased to someone else for $1,000 more than Bittner had agreed to pay. *Id.* Bittner filed a lawsuit against the car dealer under the Ohio Consumer Sales Practice Act ("the Act"), claiming that the car dealer had violated the Act by failing to give her a receipt for her deposit; she also alleged a cause of action for breach of contract. *Id.* On the morning of trial, after about eight months of negotiations, the car dealer and Bittner agreed to settle the case for $3,500, exclusive of attorney's fees. *Id.* The Act provided that "[t]he court may award to the prevailing party a reasonable attorney's fee

limited to the work reasonably performed, if . . . [t]he supplier has knowingly committed an act or practice that violated this chapter." *Id.*

Bittner requested $10,200 in attorney's fees. *Id.* After conducting a hearing, the trial court awarded plaintiff $7,115 in attorney's fees. *Id.* The Court of Appeals for Butler County reversed the trial court and held that one of the most important factors to be taken into account when considering the reasonableness of a fee award is the relationship of the fee award to the amount recovered. *Id.* The appellate court directed the trial court to consider "whether the amount of fees requested could be reasonably charged to a client in the absence of a statutory provision for recovery of fees from the adversary." *Id.*

The Supreme Court of Ohio reversed the intermediate appellate court. *Id.* at 467. The Ohio Supreme Court said:

At the outset, we reject the contention that the amount of attorney fees awarded pursuant to R.C. 1345.09(F) must bear a direct relationship to the dollar amount of the settlement, between the consumer and the supplier. The Act was amended in 1978 to include the payment of attorney fees " * * * to prevent unfair, deceptive, and unconscionable acts and practices, to provide strong and effective remedies, both public and private, to assure that consumers will recover any damages caused by such acts and practices, and to eliminate any monetary incentives for suppliers to engage in such acts and practices." (137 Ohio Laws, Part II, 3219.)

In order for private citizens to obtain redress under the Act, they first must be able to obtain adequate legal representation. Private attorneys may be unwilling to accept consumer protection cases if the dollar amount they are permitted to bill their adversary is limited by the dollar amount of the recovery, especially since monetary damages in many instances under the Act are limited to $200. An attorney may expend inordinately large amounts of time and energy pursuing a claim that reaps relatively small

monetary benefits for a prevailing plaintiff. We agree with the observation of the United States Supreme Court when it said: "A rule of proportionality would make it difficult, if not impossible, for individuals with meritorious * * * claims but relatively small potential damages to obtain redress from the courts." *Riverside v. Rivera,* 477 U.S. 561, 578, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986).

In addition to addressing an individual wrong, pursuing a claim under the Act may produce a benefit to the community generally. A judgment for the consumer in such a case may discourage violations of the Act by others. Prohibiting private attorneys from recovering for the time they expend on a consumer protection case undermines both the purpose and deterrent effect of the Act.

*Id.* at 465–66.

The purpose of the Maryland Consumer Protection Act is very similar to the purpose of the Act construed in *Bittner.* In *Consumer Prot. Div. v. Luskin's, Inc.,* 120 Md.App. 1, 26– 27, 706 A.2d 102 (1998), *rev'd in part on other grounds, Luskin's, Inc. v. Consumer Prot. Div.,* 353 Md. 335, 726 A.2d 702 (1999), we said, "In enacting this [consumer protection] legislation, the General Assembly concluded that it would take strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." *See also Milton Co. v. Council of Unit Owners of Bentley Place Condo.,* 121 Md.App. 100, 122, 708 A.2d 1047 (1998).

In its brief, the credit union makes no attempt to rebut the argument that a rule of proportionality "would make it difficult, if not impossible, for individuals with meritorious ... claims, but relatively small potential damages to obtain redress from the courts." *See Riverside v. Rivera,* 477 U.S. at 578, 106 S.Ct. 2686.

For the reasons enunciated in *Bittner* and *Jordan,* we hold that the trial court erred in applying a proportionality test in

judging the reasonableness of the attorney's fees requested in this case.

It is, of course, true, as the trial judge pointed out, that in ordinary civil litigation, where no fee-shifting statute exists, a litigant "would not pay $50,000 to ... [get back] $8,000." But that appears to be the precise reason why the legislature included in the Consumer Protection Act a provision for fee shifting. If we were to approve the proportionality rule, consumers, such as Ms. Blaylock, who are engaged in civil litigation with a financially superior foe, would have no meaningful right to obtain legal recourse. Upon remand, the trial court can, of course, take into consideration the degree of Ms. Blaylock's counsel's success, but a strict rule of proportionality may not be applied.

■ Another major reason the trial court gave for reducing Ms. Blaylock's fee request was that the case originated in the District Court, and in the trial court's view, that is where it should have stayed. The trial judge intimated that he believed that Ms. Blaylock would have been just as well off if the case had remained in the District Court. We hold that this, too, was an invalid reason for reducing the fee request.

Our review of the record causes us to conclude that no competent attorney representing Ms. Blaylock would have failed to have the case removed to the circuit court. The case cried out for significant discovery. In the District Court, only very limited discovery could have been obtained. Counsel for appellant needed answers to, *inter alia,* the following questions: (1) Had the credit union actually purchased FPI for Ms. Blaylock? (2) If FPI had been purchased, who had written the insurance policy? (3) Did the credit union have any proof that FPI had been purchased for Ms. Blaylock? (4) Why would the credit union allow an insurer to charge such exorbitant insurance premiums to its members? (5) Did the credit union have any proof that Ms. Blaylock was ever notified that FPI had been written on her behalf? and (6) If, as Ms. Blaylock claimed, she was never notified of the FPI, why was no notification sent in light of the fact that the credit union,

according to loan documents, had the option of not obtaining FPI? Discovery conducted by Ms. Blaylock's attorneys produced information quite damaging to the credit union's case. It would have been impossible to discover the damaging information if the case had remained in the District Court. For instance, counsel's discovery efforts demonstrated that, even though it charged its customer for the FPI, which purportedly protected it, the credit union had never seen the insurance policy (purportedly issued by Stewarts). Also, through discovery, Ms. Blaylock's counsel uncovered the astounding fact that the credit union had no proof that an FPI policy had been written. Furthermore, it was discovered that the (alleged) seller of the FPI was unlicensed to sell insurance in Maryland, thus making the (purported) contract of insurance (at least arguably) unenforceable. *See Golt v. Phillips,* 308 Md. 1, 8–14, 517 A.2d 328 (1986)(The rental of an unlicensed dwelling constituted an unfair and deceptive practice in violation of the Maryland Consumer Protection Act, inasmuch as the licensing statute was promulgated for the protection of the public.).

The credit union claims that the trial court correctly ruled that the subject case should have remained in the District Court because most of the work done in this case involved the Consumer Protection Act aspect of the case, and that part of the case had no merit. Appellee also alleges that Ms. Blaylock's attorneys misinterpret "the law surrounding [the credit union's] purchase of [FPI] on Blaylock's vehicle." According to appellee's present argument, the only right Ms. Blaylock had to recover damages was under the UCC—not under the Consumer Protection Act.

Liability under the UCC against the credit union was based on its giving Ms. Blaylock defective notice of the time of sale of her vehicle. Appellee characterizes appellant's Consumer Protection Act claim as "at best, specious, and based on the completely illogical view that [the credit union] was brokering insurance without a license." Appellee cites no facts or legal precedent for its contention that the consumer protection claim was "specious." Moreover, it is clear that the trial court

did not take the position that the case should have been kept in the District Court because Ms. Blaylock had no viable Consumer Protection Act claim. If it had adopted that argument, no attorney's fees would have been awarded because none were requested in the UCC count.

We acknowledge that the trial judge has a large measure of discretion in determining the reasonableness of an attorney fee award. *See Barnes v. Rosenthal Toyota Inc.,* 126 Md.App. 97, 104–108, 727 A.2d 431 (1999) (discussing the abuse of discretion standard in the context of a Consumer Protection Act Claim); *Head v. Head,* 66 Md.App. 655, 669–70, 505 A.2d 868 (1986). Nevertheless, the amount of an attorney fee award is subject to reversal if the judgment is clearly wrong or arbitrary. *See Bennett v. Bennett,* 197 Md. 408, 416, 79 A.2d 513 (1951). In the subject case, we hold that the trial court did abuse its discretion because it (1) applied a proportionality rule and (2) based its reduction of fee, in part, on the erroneous belief that the case should have remained in the District Court. Under the circumstances of this case, the fee awarded was unreasonably low.

The courts of this State have outlined the criteria that a trial judge should apply when determining the appropriate size of an attorney's fees award. These criteria usually parallel the factors set forth in the Maryland Lawyers' Rule of Professional Conduct 1.5. The relevant considerations are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent. *See Somuah v. Flachs,* 352 Md. 241, 265,

721 A.2d 680 (1998)(applying Rule 1.5 when determining the reasonable value of the services of a discharged attorney); *B & P Enters. v. Overland Equip. Co.*, 133 Md.App. 583, 625–26, 758 A.2d 1026 (2000)(applying the above factors to determine the attorney's fees in a contract case).

Upon remand, the trial court should apply the above factors and award Ms. Blaylock's attorneys a reasonable fee.

**JUDGMENT FOR ATTORNEY'S FEES VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE/CROSS–APPELLANT.**